[No. 1965.]

SAM OWENS *alias* JAY OWENS *v.* THE STATE.

1. WILFULLY REMOVING STOCK FROM ACCUSTOMED RANGE.— In a prosecution under article 749 of the Penal Code, which defines and prescribes the punishment for the offense of wilfully driving stock from its accustomed range, it is only necessary for the State to prove the act of driving, using or removing from its accustomed range any live stock not belonging to or under the control of the accused. It devolves upon the accused to show any fact under which he can justify or mitigate the offense.

2. SAME — PRACTICE — CHARGE OF THE COURT — TERM DEFINED.— If an offense is made to depend upon the fact that it is *wilfully* done, it is necessary for the trial judge to define the word "wilful" in his charge to the jury. The trial judge, in this case, defined the word as follows: "By *wilfully* as used in this charge is meant that the act was done without reasonable ground to believe the act of taking was lawful." *Held*, correct.

3. SAME — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for wilfully driving the stock of another from its accustomed range.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The first count in the indictment in this case charged the appellant and one Jeff Moore, jointly, with wilfully driving from its accustomed range in Williamson county, Texas, on the 29th day of May, 1884, the horse of S. M. Mantooth, without the consent of the owner, and with the intent to defraud the owner of the same. The second count charged, in usual form, the theft of the said horse. A severance being awarded upon the application of the defendants, the appellant was first placed upon trial, and was convicted under the first count, his punishment being assessed at a term of two years in the penitentiary.

S. M. Mantooth was the first witness for the State. He testified that he resided in Williamson county, Texas, and was a resident of that county in May, 1884. He then owned a small dun pony with a plain stripe along its back, branded plainly Y. D. on the left shoulder. This animal was raised from a colt as a pet in the witness's family. When it was about two years old, the witness removed the animal from its old range to another range about two miles northwest from Corn Hill, in Williamson county. The horse ran on that range about twelve months before he was missed by the witness, and witness saw him daily until he missed him, which was within three days after he was removed from that range. On the Saturday after missing the horse, the witness made an unsuccessful search for him throughout the range and among the horse stock he usually ranged with. Upon the strength of certain information, witness then went to Ratliff's place, where he received other information, and then went to the timber below the town of Florence, and at the place of B. W. Camp he found his missing animal. The horse had been gone about three months. He was, when found, in a very poor condition of flesh, and showed severe usage under the saddle, quirt and spurs. The Y. D. brand had been changed to X. D., the stroke added to the brand not having yet peeled off. The alteration in the

brand was, perhaps, a month old. About two weeks after the witness missed his horse, and before he recovered him, witness had a conversation with the defendant, in which he carefully described the missing animal to defendant, and asked if he had seen such an animal. Defendant replied that he had seen such a brand as that described by witness, but he could not remember where he saw it. The horse described belonged to the witness, and was taken from his accustomed range in Williamson county, Texas, in May, 1884, without the knowledge or consent of the witness.

Cross-examined, the witness said that he removed from the Craft neighborhood to his present residence near Corn Hill. When a colt, the animal ran in the timber near old man Craft's house, which was about one mile distant from the range on which he ran when he was taken. When it was about a year old, the colt followed a wagon into the Ewing Queen neighborhood, and was gone three or four weeks before the witness found him. The Ewing Queen neighborhood was not far from Camp's. The animal described was foaled near Camp's, and was kept in that neighborhood until he was moved, when about one year old, to the range from which he was taken. The Y. D. brand was changed into an unblotched X. D. Witness did not know, of his own knowledge, who took the horse from its range, or who changed the brand. Defendant did not proffer to help the witness hunt the horse when they had the conversation referred to above. Mr. Benson went with witness on his first hunt for this horse. Late in the evening, near dark, they saw and chased a horse very much of the size, shape and color of witness's horse, and witness told Benson at that time that he thought the horse they were chasing was the one he was hunting for. They failed to overtake it that night, but saw it next morning, and found it to be another horse. The Craft place was some seven or eight miles distant from Ratliff's. The horse ran on the range about Craft's fully a year before he was taken. John Darby and Sam Ratliff gave witness certain information upon which he acted in searching for his horse.

John Darby was the next witness for the State. He testified that for three years he had lived about five miles south of Florence on the Salado, during which time he had known the defendant as a horse trader. Witness had seen him horseback on the range, perhaps a hundred times. Witness was at Ratliff's pen in May, 1884. Among a herd of forty or fifty horses in that pen, the witness saw a dun pony, with a black streak down its back, branded either Y. D. or X. D. The animal described was so very gentle that he per-

mitted the witness to approach him and stroke his nose. The de-
fendant came to that pen about fifteen minutes after the witness
examined the dun pony. Defendant and another man who was
with him turned the horses out of the pen and drove them off. The
dun pony described went with the herd, and defendant made no
effort, so far as witness could see, to prevent him. Witness met
Mantooth on the following Sunday morning. Mantooth asked
about a dun pony with a streak down its back, branded Y. D., and
witness told him what he knew of the said pony, giving him a de-
scription of the animal he saw at Ratliff's pen.

Cross-examined, the witness stated that the animals in Ratliff's
pen, other than the dun pony, were stock horses. Witness knew
Young's brand. "It was X with a half circle over it, or D. Y."
Several men were about Ratliff's pen when witness examined the
dun pony. Allen and witness examined the pony together, and
witness saw for himself that the brand was plain. When defend-
ant and his associates turned the herd out of the pen, they did
nothing particular about the dun pony,—that is, they made no ap-
parent effort either to keep him with the herd or to drive him out.
This was about ten days before the witness saw Mantooth. The
dun pony at that time showed no sign of recent hard usage.

John Allen was the next witness for the State. He testified that
he lived in Lampasas county. He knew the dun pony claimed by
Mantooth, and on one occasion saw Mantooth hunting a horse of
such description. On one Tuesday in May, 1884, the witness saw
the said horse in a herd of horses in the hills above Ratliff's place
in Williamson county. That herd was then in the possession of the
defendant. No one was then with him. The stripe down the
pony's back and the Y. D. brand were very plain. On Wednesday
that herd was penned at Ratliff's pen by defendant and Moore, and
the dun pony was in the herd. Witness was with the herd on
Wednesday, Thursday and Friday, during which time the herd was
in the possession and control of defendant and Moore, who claimed
to own the horses. Witness left the herd on Friday night near Jim
Shaffer's pen, some seven or eight miles northwest from Corn Hill.
The herd then contained about fifty head of horses. Witness saw
John Darby at Ratliff's pen and had a conversation with him.
Witness had known the defendant as a stockman, and knew that
he, defendant, had the opportunity to know the brands on the
range. He could not say, however, that defendant was familiar
with those brands.

Cross-examined, witness said that, once between Wednesday and

Friday, during the time witness was with the herd, Moore caught the dun pony, with witness's aid, saddled him, rode him off about fifty yards and turned him loose. At that time the defendant was somewhere about the herd. Four different persons, i. e., defendant, Moore, Ratliff and Mr. Marrs, had horses in the herd. The parties named hunted to the herd together — that is, some one of the party would hold the herd while others would hunt the range, four or five miles around, and run such horses as they found for each other to the herd. Witness did not know when the dun pony was put in the herd. If the defendant helped Moore catch and saddle the dun pony witness did not know it. He was, however, somewhere about the herd at the time. The dun pony was not spurred, beaten or otherwise abused while the witness was with the herd. He was in good condition when Moore turned him loose after riding him the fifty yards, as stated. The pony was caught and ridden by Moore, the witness thought, on Friday. Moore rode the pony not exceeding fifty yards, and did not have him in such actual possession exceeding fifteen minutes. Witness saw that pony cut out of the herd several times, but he would invariably work his way back into the herd. Defendant took an active part in cutting the pony out several times. Witness did not know of his own knowledge who owned the dun pony. Witness knew the range of the horses composing that herd. It extended from the Lampasas river over a scope of country some fifteen miles in area. From the Wednesday morning, when witness joined the parties in charge, until Friday night when he left them, the horses had not been driven from their accustomed range. The horses, including the dun pony, remained in Ratliff's pen from Wednesday until Friday morning, and were penned in Shaffer's pen on Friday night.

Re-examined, the witness stated that he knew nothing of the range of the dun pony. He and the defendant were friends. Witness had not evaded process in this case and knew nothing about an officer being in search of him. Old man Marrs was with the herd of horses on Thursday, remaining with the herd some two or three hours. His son was then there and remained until Friday. Witness did not think, in stating that the dun pony was cut out of the herd fifty times, that he exceeded a fair estimate. Witness was, at the time spoken of, in the employ of Ratliff.

Martin Benson testified, for the State, that he lived about two miles north of Corn Hill, and had known Mantooth about four years. He went with Mantooth one day to look for a dun pony branded Y. D. Witness knew the defendant, whom he saw about

a month after he hunted the said horse with Mantooth. Defendant told witness that he had seen Mantooth and talked to him about the horse, but that he did not know that he had ever seen the horse. The State closed.

William Ratliff was the first witness for the defense. He testified that he was present at the pen on the occasion testified to by previous witnesses. He saw a dun horse in the herd confined in that pen, but could recollect nothing concerning the brand. The witness and the parties with him several times cut that dun horse out of the herd, drove him off some distance, but failed to keep him out. He would invariably make his way back to the herd. Witness first noticed the dun horse in the herd on Wednesday. He was an animal between three and four years old, and, the witness thought, a range horse. The herd referred to was penned two nights on the witness's place, and was not, while the witness was with it, driven over four or five miles. Witness had some young stock on the range and was looking for them. He did not know how long the herd was kept together.

Cross-examined, the witness testified that Allen, Moore and the defendant were with the herd when he last saw it. Witness at no time saw or looked for the brand on the dun pony. Darby was at witness's pen on Friday morning. The witness thought that he knew the stock range adjacent to his place, and pretty much all the stock in it. Witness had been in the range all his life, and did not think that he had ever seen that dun pony before he saw him in the herd. The defendant was in charge of the herd.

Jim Shaffer was the next witness for the defense. He testified that a herd of horses was penned at his place in the spring of 1884. They broke out of his lot, and defendant re-gathered a bunch of them next morning. Witness saw that drove of horses about his place for two or three days before that night. He saw the dun pony claimed by Mantooth about his place during the preceding summer and spring. The said dun pony was then running with Ewing Queen's old mare. Witness only knew that the colt which ran with Queen's old mare was a dun animal. He did not know that it was branded Y. D. Witness knew that defendant spent most of his time running stock on the range, and witness supposed he was well acquainted with the stock on the range.

Mr. Mantooth, recalled by the State, testified that he pointed out his dun pony to Ratliff in January, 1885.

Ratliff, recalled by the defense, testified that, some time prior to this trial, Mantooth pointed out to him a dun horse which he

said was the horse that had been stolen from him. That horse the witness did not think was the same horse that he saw in the herd described.

It was testified, in whose behalf does not appear from the record, that the defendant lived at Sam Queen's place, three miles east from Florence. Ratliff lived three miles east from Sam Queen's. B. W. Camp, near whose place the horse was found after the alteration of the brand, lived about three miles south of Sam Queen's. Shaffer's place, where the horses were penned on Friday night, was about one mile east from Sam Queen's place, and about three miles from Camp's place. The place where Mantooth lived, and from near which his horse disappeared, was about two miles north from Corn Hill, in a prairie country which ran back to the hills. Craft's place, where the horse was foaled, was on the prairie, about a mile from Mantooth's place. Those places were about eight miles from Ratliff's place, over a rough and uneven country.

The motion for new trial raised the questions discussed in the opinion.

*Makemson & Price, E. A. Strickland* and *Fisher & Townes* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

White, Presiding Judge. Two counts were contained in the indictment,—one for wilfully driving the animal from its accustomed range with intent to defraud, and one for the theft of the animal. Appellant was found guilty under the first count of wilfully driving the animal from its accustomed range with intent to defraud the owner, and his punishment is fixed by the verdict and judgment at two years in the penitentiary.

The statutes regulating this offense are as follows in the Penal Code:

"Art. 749. If any person shall wilfully take into possession and drive, use or remove from its accustomed range any live stock not his own, without the consent of the owner, and with intent to defraud the owner thereof, he shall be deemed guilty of theft, and on conviction shall be confined in the penitentiary not less than two nor more than five years; or be fined in a sum not to exceed $1,000, or by both such imprisonment and fine, at the discretion of the jury trying the case.

"Art. 750. Nothing in the preceding article contained shall be

construed to prevent any person from driving his own and other stock that may be mixed therewith to the nearest convenient point within the usual range of such stock, for separation.

"Art. 751. In any prosecution under article 749, it shall only be necessary for the State to prove the act of driving, using or removing from its accustomed range any live stock not belonging to or under the control of the accused, and it shall devolve upon the accused to show any fact under which he can justify or mitigate the offense."

Where an offense is made to depend upon the fact that it is "*wilfully*" done, it is necessary that the court should define the meaning of the word *wilfully* in its charge to the jury. (*Trice* v. *The State*, 17 Texas Ct. App., 43.) It is insisted that the court's definition in this instance was not correct. The definition given was, "by wilfully as used in this charge is meant that the act was done without reasonable ground to believe the act of taking was lawful." This definition is in exact accordance with one of the approved definitions of that word announced by this court in *Thomas* v. *The State*, 14 Texas Ct. App., 200; *Lane* v. *The State*, 16 Texas Ct. App., 173; *Wood* v. *The State*, 16 Texas Ct. App., 574; *Shubert* v. *The State*, 16 Texas Ct. App., 645; and *Trice* v. *The State*, 17 Texas Ct. App., 43.

Taken as a whole, the charge fairly and fully presented the law of the case. It was not excepted to. [There is a bill of exceptions to a charge given in another case, which has evidently been copied into this record by mistake; the style of the case, number and date of filing all show it does not belong to this case.] If the charge was deemed insufficient in not presenting the law as fully as it should, defendant should have presented special instructions covering the supposed defects and omissions. As it is, we see in it no radical or fundamental error.

We are of opinion that the evidence is sufficient. The horse was seen in appellant's herd, which herd appellant was in person controlling for several days at Ratliff's and Shaffer's. This was from eight to twelve miles from his accustomed range. The witness Darby says he saw the horse in Ratliff's pen — saw the defendant there — the defendant opened the gate and let out the horses and drove them away; the pony went with the herd,—defendant made no effort to leave him. Darby afterwards told Mantooth about this, and when Mantooth met defendant afterwards and asked him if he had seen the horse, defendant said he had noticed the brand somewhere but did not recollect where. He did not offer to help hunt

the horse. Allen, another witness, says he saw the pony at Rat-liff's pen, and defendant was at and about the herd at the time the pony was saddled and ridden by one Moore, who was also connected with the herd.

There are no other material questions presented in the case. The judgment is affirmed.

*Affirmed.*

[Opinion delivered October 31, 1885.]